The next case, Martinez v. Union Officine, and I have no idea how to pronounce the last word of that. You okay? Keep going? Yeah, I'm fine. Keep going. Meccaniche. Meccaniche. That's how you do that? Meccaniche? R-E-C-U. Yep. Okay. Counsel for Mr. Martinez, if you would. Good morning. May it please the court. I'm Sean Payne from Gennardi, Gallardo, Gonzalez, and Winograd. On behalf of the plaintiff's appellants in this matter, I would like to reserve two minutes for rebuttal. Go ahead. Thank you. Your Honor, I'm going to address two distinct issues in this matter, with the third being handled by my co-counsel. The two issues which I will be addressing are the issue of minimum contacts, and the second will be that of the subsumption of claims, of negligence claims, into the Product Liability Act claims that the plaintiff had below. Now, to start with point one, it's clear here, Your Honor, based on the record of evidence, that Union, the defendant in this matter, had significant contacts with the state of New Jersey. Physically, they were present in the state of New Jersey on numerous occasions. That was all after the fact, right? So it would be most helpful, to me at least, if you went directly at the point of attack that your opponents make in their briefing, which is you didn't plead in your amended complaint any kind of negligent training or any other sort of negligence associated with stuff that happened after the sale. So you pleaded a design defect case. That was your choice, and that had nothing to do with what those later contacts were. Can you tell us why you think they're wrong about that and why those later contacts would have anything to do with what you actually did plead? Well, thank you, Your Honor. Yes. I believe that there is an issue here in so much that the subsumption of the claims for the training, the installation of the machine, and for the maintenance of the machine have been subsumed. It was pleaded originally in plaintiff's original complaint in the state court in New Jersey and re-pled in the amended complaint that there were issues involving the maintenance of the machine at issue and the installation of the machine at issue. So that goes directly to- Your whole case depends on our believing that the New Jersey Act, I'm trying to think of the precise- The Products Liability Act, Your Honor. Yeah, Products Liability. I've just been calling it the NGPLA. That the New Jersey Product Liabilities Act allows you to not say something and then later argue it in your briefing because the NGPLA covers all of that. That's what you mean when you say subsumption? Well, Your Honor, I believe it's two different issues here. The negligence claims are subsumed no matter what we do against a manufacturer and a servicer of a machine as was the case with Union here. Yeah, but it's negligence claims that are related to what you pled. In other words, if you had a negligence claim with respect to the design defect, it would be subsumed under the statutory cause of action that you pleaded, and I don't think anybody would disagree with that. I don't think the other side would disagree with that. But what you seem to be arguing is anything with the prefix negligent or negligence on it is necessarily subsumed within your design defect claim under the New Jersey Product Liabilities Act, and that's the part that they're attacking and it's the part I want you to respond to. On what basis do you make that legal claim that a design defect claim under the NGPLA is so capacious that you can bring in any kind of negligence claim, whether it relates to design defect or not? Your Honor, if you look at the Napurano case, which was cited in the reply brief, it does talk about these different types of negligence claims, and they're handled differently depending on the nature of the entity which the Product Liability Act claim is made against. Which case do you talk about from your reply brief? Your Honor, it was Napurano. And I could give you the full citation of my rebuttal argument, Your Honor. I don't have it before me right now. But the Napurano case was a district. What's the name of that again? Napurano Steel. Napurano? Napurano, Your Honor, with an N. Napurano? Yes, Your Honor. In that case, the district court below in the District of New Jersey reviewed a similar kind of issue with regards to a negligence claim against a manufacturer of a machine. And it held that under the terms of the Product Liability Act, they didn't have that choice. They couldn't say that there was ancillary negligence because the Product Liability Act had been amended, Your Honor, in the 1990s so that claims relating to the installation and maintenance of machines from manufacturers and servicers of the machines specifically had to be subsumed into the Act. There was no longer an opportunity to get an ancillary negligence claim against a manufacturer in relation to a claim relating to the Act. Well, it was a claim. I guess I'll have to go and read Napurano more carefully. But are you telling us that the District of New Jersey said, hey, any kind of negligence claim, whether it's related to the pled claim or not, is subsumed? In other words, if they said your, if the District of New Jersey said your claim for negligent installation and training is subsumed in your New Jersey Product Liability Act claim for a problem with installation and training, I could understand that readily. Is that what Napurano says? Or does Napurano say, was Napurano a design defect claim case? Your Honor, it was more of a combination of a product issue that was handled by a third party. In that sense, it was a crane that fell onto a house, I believe, and the user of the crane then tried to go after the manufacturer of the crane under a theory of ancillary negligence as opposed to going through a contract dispute issue. But there were claims made in the complaint by Napurano in that case relating to a design defect that then had to be subsumed. So it ended up with the court deciding that you can't have these ancillary claims of negligence when there is a Product Liability Act claim specifically pled in the complaint. And here, Your Honor, in the original complaint the plaintiffs had in the Superior Court of New Jersey, there were claims made of issues with the maintenance. So what? What does that have to do with what you pled in federal court? I don't mean to be flip about it, but I don't understand why the assertion, hey, I made a claim before, makes a difference when what's in front of us is what was claimed in the federal court in the amended complaint. Because, Your Honor, it was made in the amended complaint. There was references in the amended complaint to issues with the maintenance and the installation of the machine at issue. Point to us where you made the claim, because I went back and I read the amended complaint and I read it the same way that Judge Wiginton did. It sure looked to me like you were making a design defect claim. That's the, I can read you the language if you want, but it had all the appearance to me of being a design defect claim. Let me, there's, there's, it's in three counts, and the first count says the defendant union breached its duty as set forth in the New Jersey Product Liability Act, and says specifically the product was designed with a bracket containing emergency stop mechanism that was unreasonably dangerous. The foregoing defects existed when the product was under the control of the defendant. That sounds to all the world like, I don't know how you read that otherwise than a design defect claim. Well, Your Honor, that's, it is a design defect claim. Okay. That one right there. So, and then the second claim you make is a failure to warrant claim, and it's based on the design defect. It talks about alternative designs were available, they didn't use them, and they didn't warn us about this defect. And then the last claim is the loss of consortium. So, where in this, and I was just quoting from page 47 of the appendix, and page 8 of the amended complaint, and page 9 of the amended complaint, where in there is there anything that would prompt a reader to say, they're making a claim for negligent installation, maintenance, and training. Well, Your Honor, I don't think you can ignore the fact to, and I understand what you're saying with regards to the pleading in the amended complaint in the federal court. I think there's an issue that comes up here, though, when you're looking at the originally filed complaint in New Jersey, which put defendant union on notice of the nature of the claims. Yeah, but notice pleading, notice pleading in federal court is based on the latest pleading in federal court. It's not legacy notice pleading. I'm sorry. It's not legacy notice pleading in federal court, right? What's said in the first or the second amended complaint doesn't get the benefit of the original complaint. It certainly doesn't get the benefit of what was done in state court if there's been an amendment and removal. So, I mean, the problem I'm having about this subsumed argument is I've just briefly read the complaint. It strikes me as well done, but I don't see any of these kind of subsumed claims even referenced in the first count. In the second count, it's not where they probably would have been referenced, nor is the third count, but they just aren't there. And so maybe it makes sense. You want to talk about subsumed, but you also want to talk about some other things, too. I think you said minimum contacts, and so it probably makes sense then, at least from my perspective, to say, assuming that we like the notice pleading rule and assume that we're going to do a pretty canonical application of the notice pleading rule, maybe getting on to minimum contacts and kind of beginning to explain why these contacts that took place after the sale, generally speaking, could somehow kind of, that purposeful availment could somehow get us into a place where we begin to have personal jurisdiction. Sure, Your Honor. So I'd love to hear you on that. Yes, Your Honor. Thank you. I think it's very important to look at those contacts after the sale. I think that's the crux of this entire issue. When you look at the issues with the machine, it was not producing as much as it should. It never came up to the point where it was doing what it was intended to do when it was bought by the plaintiff's employer, Primex, from Union. It never reached the output that they needed and which was guaranteed to them. Those contacts, specifically the physical presence in New Jersey of representatives from the defendant on 59 different individual work days is significant here. We know there's lots. Tell us why it's significant. That's the nature of Judge Phipps' question, I believe, and I'm interested in that too. How do the contacts that existed after they took delivery create the kind of minimum contacts you need with respect to your design defect case? Maybe I should start by asking this. Do you agree or disagree that when we're assessing personal jurisdiction, we do that on a claim-by-claim basis? I acknowledge that, Your Honor. Okay. Since it's a design defect claim, how do those later contacts bear on that design defect claim in a way that allows us to say, oh yeah, purposeful availment of personal jurisdiction? Well, Your Honor, the maintenance that was done on the machine, even if we take the issue of, you know, the maintenance and everything that is not specifically put in the complaint, be that as it may right now, you still have to consider that and the nature of the issues with the machine itself. It wasn't producing what it was supposed to produce. That's a significant problem. And the individuals from Union came to New Jersey to fix that problem. It was their machine. They manufactured it. They took it upon themselves, essentially here, Your Honor, to fix those specific issues with the machine. That is very important. And the nature of the length of time that was spent in New Jersey by representatives from Union is very significant as well, including the President of the Union himself coming into New Jersey, standing before the machine with representatives from Primex. Gotcha. Okay. I think we have your answer. I guess the one follow-up. None of those contacts, though, were designed to make another sale in New Jersey, though. Well, Your Honor, not necessarily. We don't necessarily know that because one of the other issues that will be addressed by my co-counsel is the issue that, and you can see it in the e-mails and the record, Your Honor, there was an ongoing business relationship between the two entities. Now, it doesn't necessarily mean, and I would agree with you on this point, that another machine would be sold in New Jersey. But I think in this case, the important thing to look at is the machined issue and the contacts with that machine in relation to the accident. All right. And can you just remind me, you said at the start, you represent Mr. Martinez. Mr. Martinez and his wife. And his wife. Okay. And I guess we'll hear from your co-counsel. Your co-counsel represent the same parties? That's correct, Your Honor. I'm not sure why we're split in time, but if we're doing that, you go ahead and have a seat, and we'll hear from Mr. Winograd because usually we only hear from one counsel. Thank you, Your Honor. Thank you, Your Honor. My name is Richard Winograd. May it please the Court. Why are we hearing from two different people on the three-second limit? Because the question of personal jurisdiction, specific personal jurisdiction, is divided very evenly between the purposeful availment of the jurisdiction, whether or not the conduct that we're complaining of arose out of those purposeful availments, and traditional notions of fair play and substantial justice. And because they're divided so evenly, I thought that it was appropriate because this case, I think, is pretty clear on minimum contacts, and I'll address what Judge Phipps just asked my co-counsel about the subsequent conduct of minimum contacts being relevant here that seems to have been ignored below. It's very relevant, as I will explain, but the reason I thought traditional notions of fair play and substantial justice was so important is that we had the Ford Motor Company case in the Supreme Court in 2021, March of 2021, and it was Justice Gorsuch and Justice Alito in their concurring opinions that spoke very critically of international SHU and how it's almost obsolete in the present climate of global communications and the Internet and the virtual world we live in. So that's why I was going to get to that. Mr. Winger, it's still the case, right, that even after Ford Motor Company, the notion of minimum contacts and fair play and substantial justice, the international SHU framework, that still governs, right? It's still viable. It hasn't been overruled specifically. Justice Kagan wrote the majority opinion in the anonymous court, and this court is now in the Third Circuit, had O'Connor back in 2007. That is the case about the slip and fall in Barbados. Ford Motor Company is a product liability case. I think I can illustrate why just I think Judge Fripp's question is very important. I think subsequent to the sale, there was these 59 days of contact. And why is that relevant? I can illustrate by a hypothetical, for instance. Say you had a company that wasn't union but called Confederate, and they're based not in Milan but Venice, Rome. And their job is specifically to work on calendar machines that are sold by companies like Union to New Jersey. And they come in after the sale, and they coordinate the use of the machine. They fix the machine. They do all kinds of things to help it work properly. And they're there 59 days. And, however, at some point, there's an accident to Roberto Martinez because of something that they have alleged to have done wrong in those 59 days. They're a separate company now. They're a separate company, but they worked on the machine that Union sold to them. Would there be any question that they would be subject to personal jurisdiction? Well, perhaps there would be if the claim that was being made against them was a design defect claim because then they would come in and say, we didn't design it. We had nothing to do with it. But it's irrelevant, right? Because if it's negligence, you know, we may have framed the claim as negligence instead of design defect. The question is jurisdiction, not the nature of the remedy. I think what Judge Howard is getting at is that at least as I read the cases, we've got this notion of purposeful availment in the specific jurisdiction context, right? We aren't in the at-home space of general jurisdiction. We're in specific jurisdiction. Absolutely. And so when we say, did you come to the state, right? Did you purposely avail of the state? And then the next question is one of relatedness. Why were you there? And we look at relatedness a little bit like the claim. And so the tension that I see with your case is I don't, at least as alleged, I don't know that they were there because of the design defect. They weren't there for something that occurred pre-sale like the design defect did. They were there post-sale. Now, maybe if you could say every time there's a sale, we give you coverage and we show up and we're always there, and so the sale doesn't just buy you the machine, but it buys you everything else and we're there to fix any problems with the design, then maybe you're working on relatedness. But right now, relatedness of just being there and doing some maintenance on it and a design defect, that strikes me as the biggest bridge for you to cross in this case. Well, there's two issues with that, you know, respectfully. They came in after for post-sale maintenance and servicing of the machine. And did it relate to the design defect claim? We know now from the Ford Motor Company case that the question of arising out of that conduct has been watered down substantially. We don't even know if that's viable anymore. But the way the man got hurt had to do with that design. And they were there to address the calendar machine full stop. They're doing everything they can to facilitate the workers doing this machine in a safe manner. So it may arise out. I think it's easy to say it arose out of the design defect claim. So what I'm trying to say is the subsequent conduct is now not just post-sale routine things that people do after they sell a machine. He, Mr. Fernando Passoni, who submitted the affidavit, the owner of the company in Italy, came here in April of 2018 after the warranty period had ended. So that informs us, does it not? He's here to hopefully cultivate that relationship. Okay. I think it's arguably a fair inference that he's coming here, he's doing that, not because he's obligated under the warranty, but because he wants to hold this customer. They're a global... Gotcha. You got that. Gotcha, Mr. Winograd. Yeah. And we've given both you and Mr. Payne additional time. And I did not ask, so I don't know whether there was any time reserved for... There was two minutes, so we'll hear from you on rebuttal. Two minutes? Okay. Okay. All right. I'll yield. Thank you. Thank you. We'll hear from counsel for union. Good morning. May it please the Court. My name is Alexander Pankow. I'm joined by my partner, Mike Sloan. We represent the defendant appellee, Union Officine Mechaniche S.P.A. It's an Italian manufacturer. Right. We're familiar. Okay. So I think probably I'd like to piggyback on the line of questions that the panel had for the appellant. I think the panel put its finger on the problems in Mr. Martinez's case, and the district court was absolutely correct in dismissing the case. Even now, it's unclear the theory of the negligence claims that Mr. Martinez is putting forward. I think something that the panel should keep in mind is the court provided the plaintiff with a road map. The first time around, we moved to dismiss both on jurisdictional grounds and on 12B6 grounds. The court found that the original complaint contained zero factual allegations supporting the product liability theory of claims. The court granted the motion and gave very specific instructions on how to replead, consistent with Twombly and consistent with Iqbal, and also to link my client's contacts in New Jersey to the claims that were being pled, because the original complaint, contrary to what we've just heard, didn't include any facts, didn't include any specifics about what the alleged negligence was, whether it was really tied to the design defect or something else. We're familiar with the procedural history and with the arguments you made in your brief about, hey, Judge Williamson told them they were on notice, et cetera. I'm interested in your answering their argument that you really were on notice, that the original complaint talked about negligence, I mean the original complaint in this action, and that the amended complaint, even if the claims aren't artfully drawn, there's still language in that complaint that makes references to negligence. So you're not really surprised, and under Rule 15, leave to men should be freely granted. You should be, you know, they shouldn't have gotten the ax here. They should have had a chance to fix a problem, and they didn't, and that's just not right. Right, so I understand the question, and the answer is that's not true, number one. We were not put on notice. That was part of the problem. I think it's evident even in the briefing, and the court made it very clear, because this goes back to the duty of Mr. Martinez to come forward and commit to a theory of the case and provide the facts so union is able to defend itself if the case stuck. Even coming in today, I was not sure if the theory of negligence was, it was a defectively designed machine that just, you know, union representatives allegedly continued to maintain, service, and install, or whether it was a new theory of it was not a defective machine, and it was negligently installed, you know, and there was negligent training provided. That's the danger, and that's what the U.S. Supreme Court has cautioned litigants in federal practice. You can't, you have to plead sufficient facts to put the other side on notice. So, no, we were not put on notice, and I don't think the facts or the intention of Mr. Martinez is as has been stated, because if you look at the law, it's very, very clear that negligence claims that are not tied to an originally defectively designed product are not subsumed by the NJPLA. It's very clear. The cases from New Jersey Supreme Court, including from the Third Circuit, all summarizing the body of law that, yes, negligence claims that are tied to the original design defect are subsumed, but separate negligence-type theories that are not premised on an already defective product are not, and they must have been separately pled. The fact that they weren't, after the judge put them on notice and told them, go ahead, plead your case, and explain why the union's contacts with New Jersey. How does the failure to warn claim work in here? Does that pull any of this other stuff in? No, because the failure to warn is tied to the design defect in its inception, which according to the amended complaint, just like in the original complaint, tied back to when union allegedly placed it into the stream of commerce using Mr. Martinez's words, which under the law means when the manufacturer in this case loses control, gives it over, which would be when it was sold and delivered, both in Italy, and I think some of the facts that the court found in the record that was obtained during jurisdictional discovery, which completely contradicted the amended complaint's allegations were, there really were no foreign contacts that tied back to the claims. Union did not know that the product was going to be used in New Jersey. I mean, we've cited the record. So let me just, this strikes me, what you're saying is, you weren't saying that there was no purposeful availment, right? There was plenty of purposeful availment after the sale. So. But specific jurisdiction seems to have those, you know, it's a one-two punch, purposeful availment, relatedness, you know, there's that related to, you know, that the litigation relates to the foreign contact. And so at one level, what it sounds like you're saying is, before the sale, there might not have been purposeful availment. And that's what matters. Well, but, you know, Ford's a little interesting because, you know, not everything they did was before the sale. Okay.  So I agree with you, Your Honor, that in my view, Ford, McIntyre, and the Jamos case from this court are, I think, the most applicable body of law to these set of facts. I respectfully disagree on the purposeful availment. We are challenging purposeful availment. We do not believe there was purposeful availment because you have to look at the conduct. There was purposeful availment later. I mean, they keep saying 59 days, 59 days. They showed up. They showed up. I think what you're hearing from Judge Phipps and what I was asking them is, do those, that sure looks like purposeful availment. They're showing up. But does it matter that they showed up? It doesn't matter, but also. Why? Because it's after the fact tied to the claims. And I understand the relatedness question. But I think because, frankly, I don't want to concede any one of the prongs because I don't think we have to, and I don't think the facts support it. So just on the Ford issue. So on purposeful availment, the only reason the union representatives, and many of them are not even employees, it's not clear. But the only reason they were in New Jersey is that this solitary product somehow found its way into New Jersey. That's different than Ford. What you're saying is not that they, I'm not sure why you're choosing to fight on this hill. It sounds like your argument really is we may have purposely availed ourselves of the form of New Jersey, but that had nothing to do with what they've actually claimed in their case. Well, that is true. I agree with the point that the context of coming into the state after any potentially relevant time period to the claims that's pled goes to the relatedness, and I agree. It doesn't matter. But I guess what I'm trying to get at is it's all relatedness. If the president of the company came to New Jersey and punched somebody, right, we wouldn't say, oh, he was just here for a one-time visit, that has nothing to do with it. He'd be totally availed, he'd be subject to minimum contacts for an assault, a battery, a tort claim, whatever. And so the fact that he's there works for purposeful availment. But personal jurisdiction is not just a one-trick pony on purposeful availment. It also involves relatedness. And so I guess Judge Brewer and I are a little maybe questioning why you're saying there wasn't purposeful availment when we really want to hear from you telling us why his presence there in the other 59 days had nothing to do with this claim. This isn't an assault claim that someone there did an assault. This is a design defect claim that happened. And so that's, if you want focus, or at least what two of the judges on the panel are wanting to know, it's not to fight us on purposeful availment, but to tell us why they were there, doesn't meet the relatedness requirement in a way that still comports with notions of substantial, with verifying substantial justice. So just to go to the relatedness, and then maybe if I have time I'll come back to the other issue if it's still of interest, but there is no relatedness because the claims pled both in the original and the amended, and the amended is what governs. It was a design defect failure warrant claim at the inception when the manufacturer sold and delivered the product. Anything that happened afterwards is irrelevant, and even in the record itself that's before the panel, those visits were not for the health and safety of the workers. They didn't deal with a guard or no guard. I mean, it had to do with the performance of the product. Let me just spin out a hypothetical. Let's say they sold the product and they said, wherever you place it, we'll send a crew to come check on it, you know, regular scheduled maintenance. You know, we'd love to be there. It'll be a 21-point inspection. We'll look at all these things, and we'll also look for design defects, and we'll report back, and we'll check if there's any problems, and we'll try to cure those. So if there was this kind of promise, you know, welcome to our family, we want to have transactions, we want to grow the goodwill, we want to do all that, and they were there doing those services to make sure that the machine still works and is still good and any design defects can be fixed by their fix-it people on the spot, then we're getting a lot closer to relatedness, right? Relatedness, but I also, not to go back to the purposeful availability, but we're going on both prongs now at this point, and the hypothetical that Your Honor just raised I think is the danger in Mr. Martinez's briefing and this whole foreseeability and stream of commerce line of personal jurisdiction. That's no longer the law, and that's why I brought up McIntyre, because some of the earlier questions from the panel, I thought, really honed in at the heart of the matter. The law now for personal jurisdiction is a claim-by-claim analysis looking at the defendant's contacts in the forum. So that's why it's so important about what union knew when it engaged in the transaction and what it did and what its overall activities and conduct are, not just with respect to this sale. And I agree with you, in an intentional toward, one act could be enough. What's in McIntyre? Point us to the language in McIntyre that you think, like, that's the killer language. That's the good stuff. That's the stuff that this Court can rely on, should rely on. Well, the McIntyre decision discussed about the dangers about the stream of commerce and foreseeability factor. Right, and then what I took from McIntyre was the Court saying, look, there's enough here to say that the defendant wanted to take advantage of the U.S. market, but not enough to show that the defendant wanted to take advantage of the New Jersey market. Right. There's not enough. So, but that's not really speaking to the point we're talking to here when you say, yeah, the stream of commerce theory is different or it's gone or something like that. What is it in McIntyre or in any other case that you want to point us to that will help us know that these after-the-fact appearances of union employees and the union president in the state of New Jersey are not relevant to, are not legally connected to, the specific claims we have to deal with? So on the related, on the temporal issue, I think the Jamos case from this Court is the most on point. In that case, there was an affirmative dismissal on personal jurisdictional grounds because, again, there were no contacts that were relevant to the claims as pled by the plaintiff. McIntyre is relevant for the point that, which is what we have here. There was no direct targeting of New Jersey here for selling the product for the claims that have been pled, which is a design defect claim. So the point is there was one solitary calendar, that's the product that my client provides, that just wound up in New Jersey. It could have wound up in Alaska. I mean, given it was the Prime Minister's business decision to move it around. And even in the situation in the hypothetical that Judge Phipps put forward, even if Union went ahead to go service it, it was not something that they knew or agreed to at the time when they sold the machine. That goes back to the relatedness factor tying it to the design defect claim. So at one level, it seems like, look, we're just talking about kind of, relatedness is just naturally going to be a question of degree. And if what you're saying is they were later there in a way that was just incidental to the design defect, then no personal jurisdiction. But if they were there in a way that was significant to the existing business relationship and the machine was part of that and it's all just kind of nestled close together, then there might be relatedness. Well, that goes to this Court's recent decision, which reaffirms prior cases that you've issued on this issue on relatedness. There has to be a strong relationship between the defendant, the forum, and the litigation, meaning the claims pled. Here, once again, not to belabor the point, there is no negligent installation or negligent training claim. There isn't. I mean, what happened at the beginning when they sold and delivered the product all in Italy?  Why should we affirm a with prejudice dismissal? I think the judge very astutely looked at the record. I mean, you have the whole record in front of you. And she looked at the claims twice now that have been pled. They were doubled down on the design defect claim. And frankly, if you look at the record itself, there's not even anything in there about, you know, a missing guard or anything that goes to the design defect type claims. In fact, there's not even anything in there about my client training the plaintiff. I mean, and by the way, she made very pinpoint findings, so much so to reconcile the actual evidence, even when she accepted it, notwithstanding it being inauthentic against the allegations in the complaint. I do want to say one thing, if I may, just 30 seconds on the last prong, because I think the tradition. 30 seconds. Okay. Go, Mr. Pinker. The prongs all weigh in favor of union. You know, the plaintiff did have recourse against the employer. I didn't have a chance to brief it because it was raised on reply. The workers' compensation laws do have exceptions, and this one falls within the exception. If an employer, for example, allows its employee to work on a dangerous machine, one that allegedly didn't have a guard or one that allowed him to clean while the rollers were spinning, that falls within the intentional wrongs exception to the workers' compensation laws. So Mr. Martinez has recourse against it. And so that also weighs in allowing him to pursue the claims against us in Italy, and New Jersey has an interest to make sure that its Product Liability Act ensures stability and manufacturers, domestic and foreign, know what the parameters of claims are under that particular act. What about the agreement that any lawsuit will be brought in Italy? Are you still standing behind that? I'm standing behind that as McIntyre would inform us in terms of its relevance, that it shows a foreign defendant's intent and willingness to be subject to the sovereign, to the foreign state. So I think it goes to the substantial notions of fair play and substantial justice in terms of what is fair here to haul a very small company with one office in northern Italy into New Jersey when it never does any business, has no presence in the state whatsoever, and deliberately tried to insulate itself to be able to litigate its defenses in a jurisdiction that it's familiar. This is not Ford. That's the big difference. Ford goes our way. With Ford, both the relatedness and purposeful availment couldn't be any clearer. In that case, okay. All right. Thank you. I didn't know if I answered your question. Thank you. We've got two minutes. Mr. Payne. Thank you, Your Honor. Just initial housekeeping here, Your Honor. The case that I was talking about before, the Napurano, that's Napurano Iron and Metal Co. versus American Crane Corp. It's 79F sub second 494. And then second to answer and to go back to one of your initial questions you had for me, Your Honor, Jordan, when looking at the amended complaint and trying to see where is the claim for issues with the maintenance and the installation, if you look at Appendix 47, Paragraph 3, it's right there, Your Honor. The product was designed, manufactured, assembled, marketed, repaired, serviced, maintained, modified, installed, sold, and leased by defendant union, its agents, servants, or employees. It seems that there's a bit of a confusion here, Your Honor, as to what the pleading standards are with regards to a product's liability action. It seems like the union would like for us, and as much as I would love to do so, prove my entire claim in the complaint itself. I think there has to be some wiggle room given here when you're looking at the initial pleadings. Which paragraph were you looking at? It's at Appendix 47, Your Honor, Paragraph 3. Paragraph 3. Right at the top. Yeah. I think you had to give, you know. That's a statement. You did make the statement that the product was designed, manufactured, assembled. That's true. That's a statement. The only statement of a breach of duty begins in Paragraph 5. And the only thing it talks about is a design defect. So, why was Judge Wiginton, maybe I should ask it this way. What in Paragraph 3 should have put the defendant on notice and should have put the district court on notice that what you're claiming is a breach of duty associated with the repair, service, maintenance, or installation of the machine? Well, Your Honor, it gets into the issues with the Products Liability Act and the nature of the way that parties are allowed to plead their pleadings. Based on the Products Liability Act, we're limited. We have to plead this in a manner that it says it's a products liability action. Having something else for the negligence of the installation, that goes towards kind of like the Naparano case where they had ancillary negligence claims. It doesn't work. No matter what we would have done, no matter how we would have maybe more artfully pled those pleadings, it would have always ended up with that claim being one for products liability under the Products Liability Act. There was no way for us to make that necessarily clear and maybe we could have done it a little bit better, Your Honor, admittedly. But that shouldn't be a death sentence for this case here. Okay. Well, we thank you, Mr. Payne, Mr. Winograd. We thank you, Mr. Payne. We'll take the matter under advisement and we'll recess court.